NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210046-U

NOS. 4-21-0046, 4-21-0047 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 16, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* D.C. and T.L., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | No. 16JA161 |
| v. | ) | 16JA162 |
| Buford L., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, concluding that the trial court's finding of unfitness and termination of respondent's parental rights were not against the manifest weight of the evidence.

¶ 2       In November 2016, the State filed a petition for adjudication of neglect or abuse with respect to D.C. and T.L., the minor children of respondent, Buford L. In January 2017, the trial court adjudicated the minors abused and neglected, made them wards of the court, and placed custody and guardianship with the Department of Children and Family Services (DCFS). The State filed a motion to terminate respondent's parental rights in July 2019. Following a hearing on the State's motion in October 2020, the court found respondent an "unfit person" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The court then held a best-interests hearing in January 2021, where the court found it was in the minors' best interests

to terminate respondent's parental rights.

¶ 3        In January 2021, respondent moved to consolidate the two cases into this one appeal, and we granted the motion. On appeal, respondent argues the trial court erred in terminating his parental rights; specifically, he alleges the trial court's unfitness findings and best-interests determination are against the manifest weight of the evidence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        On November 1, 2016, the State filed a petition for adjudication of neglect and abuse with respect to D.C. (born December 5, 2008) and T.L. (born February 22, 2012), minor children of respondent father, alleging the children were neglected and abused under various sections of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a), 2-3(1)(b), 2-3(2)(ii) (West 2018)). After a shelter-care hearing, the trial court issued an order finding probable cause for abuse and neglect based upon ongoing domestic violence between the minors' mother and her paramour. The trial court placed temporary custody and guardianship of the children with DCFS.

¶ 6                              A. Adjudicatory Proceedings

¶ 7        On January 26, 2017, the trial court issued an adjudicatory order, based upon a stipulation, finding the minors abused and neglected as defined by section 2-3 of the Juvenile Court Act (705 ILCS 405/2-3 (West 2018)) in that the minors were in an environment injurious to their welfare as defined by section 2-3(1)(b) (705 ILCS 405/2-3(1)(b) (West 2018)); and the minors were at substantial risk of physical abuse as defined by section 2-3(2)(ii) (705 ILCS 405/2-3(2)(ii) (West 2018)). The court found the mother had inflicted the abuse or neglect.

¶ 8        The trial court also issued a dispositional order on January 26, 2017, finding respondent unable to care for, protect, train, educate, supervise, or discipline the children, and

placement with him was contrary to the children's health, safety, and best interests because respondent "[was] not able to care for [the] child[ren] at this time." The court granted the State's petition, adjudicated the children neglected, and made them wards of the court. The court ordered DCFS to maintain custody and guardianship over the children.

¶ 9                    B. Termination of Respondent's Parental Rights

¶ 10            On July 31, 2020, the State filed a motion seeking a finding of unfitness and termination of the parental rights of respondent to D.C. and T.L. The State alleged respondent was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) on the following seven grounds: (1) he failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) he is depraved (750 ILCS 50/1(D)(i) (West 2018)); (3) he failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors from his care during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2018)); (4) he failed to make reasonable progress toward the return of the minors to his care during any nine-month period following adjudication of neglect, specifically the nine-month period between January 26, 2017, and October 26, 2017 (750 ILCS 50/1(D)(m)(ii) (West 2018)); (5) he failed to make reasonable progress toward the return of the minors to his care during any nine-month period following adjudication of neglect, specifically the nine-month period between October 26, 2017, and July 26, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2018)); (6) he failed to make reasonable progress toward the return of the minors to his care during any nine-month period following adjudication of neglect, specifically the nine-month period between July 26, 2018, and April 26, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)); and (7) he failed to make reasonable progress toward the return of the minors to his care during any nine-month period following adjudication

of neglect, specifically the nine-month period between October 29, 2018, and July 29, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 11    The State further contended termination of respondent's parental rights was in the children's best interests and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to the children's adoption.

¶ 12    In October 2020, the trial court held a fitness hearing. Respondent attended the hearing, represented by counsel. The State called two witnesses. First was Erica Chevalier, of Lutheran Child and Family Services. She testified she was the caseworker from April 2019 to October 2019. She said respondent completed his tasks except for participating in his required sexual perpetrator assessment. Although respondent's lack of participation in the assessment caused concern, there were other matters related to his behavior that were troublesome: for example, Chevalier said, "there were some gun things going on Facebook," he had two indicated sexual perpetrator allegations, he only showed interest in his daughter, T.L., rather than both children, and he had his rights terminated to his other children.

¶ 13    On cross-examination, respondent's counsel presented Chevalier with what appeared to be a completed sex-offender evaluation where no treatment for respondent was recommended. On redirect examination, Chevalier said she had not seen the evaluation before the hearing.

¶ 14    Next, the State called Lynley Young with Webster-Cantrell Youth Advocacy. Young said she was the caseworker after Chevalier from October 2019 to October 2020. She said respondent was to engage in mental health, domestic violence, and parenting services. She confirmed that he was also supposed to participate in a sex-offender risk-assessment. Respondent told Young he had completed the assessment, though he could not name the provider. He only

recalled it was in Jacksonville. Young contacted Memorial Behavioral Health, where he was referred, but that agency had no record of respondent. Young said respondent completed all other services.

¶ 15        Young said she was not "able to observe [respondent] in action *** in any kind of visitation or things like that" because "he has been, since [she has] had the case[,] in Cincinnati and then Atlanta, Georgia." However, she said she knows he visits with D.C. under his mother's supervision when "he is in town" but he has not had any visitation with T.L. due to a current order of protection in Sangamon County due to "harassment, stalking, and intimidation."

¶ 16        Young testified that respondent has been "irritated" about the case, believing he had done everything asked of him. She said he has made at least two hotline calls to DCFS "about his daughter" but each has been unfounded. He has also threatened the foster parent (respondent's sister), which was the basis of the order of protection. When asked if she thought it would be safe and in the best interests of the minors to be returned to respondent, she said no because of "the 50[-]year sexual retention for allegation number 19 for sexual penetration." Like Chevalier, Young thought respondent's main focus was on T.L. more than on D.C. On cross-examination, Young admitted respondent's sister and mother, the foster parents of T.L. and D.C., respectively, do not get along.

¶ 17        The State presented certified copies of respondent's following convictions: (1) aggravated battery in Macon County case No. 07-CF-579, a Class 3 felony; (2) criminal trespass to a residence in Macon County case No. 07-CF-579, a Class 4 felony; (3) unlawful possession of a controlled substance with a prior conviction for the same offense in Macon County case No. 08-CF-831, a Class 1 felony; (4) unlawful violation of an order of protection with a prior aggravated-battery conviction in Macon County case No. 08-CF-1629, a Class 4 felony;

(5) unlawful violation of an order of protection with a prior unlawful violation of order of protection in Macon County case No. 09-CF-1145, a Class 4 felony; and (6) unlawful delivery of cannabis in Macon County case No. 12-CF-1034, a Class 3 felony. Without objection, the trial court took judicial notice. The State rested.

¶ 18 Respondent testified he resides in Atlanta, Georgia, is employed by a concrete company, and he owns his own company "that does the same exact thing." He said he owns the home in which his mother and D.C. reside. He acknowledged the sex-offender evaluation presented to him by his counsel. He said a Webster-Cantrell Hall caseworker referred him to the provider that conducted the evaluation but he did not "want to say an exact person because [he] had so many different caseworkers around that time." He also said he completed all other services as well.

¶ 19 Respondent said he had "a rocky past" but he has "accepted accountability for that." He said, since his children were born, his life has changed for the better. He said he was indicated on the sexual complaints in 2018 but he was never charged criminally for the conduct. (The underlying facts of these sexual complaints are presented in this record.)

¶ 20 On cross-examination, respondent said he had "never used cocaine." When confronted with a positive result from 2016, he said "[w]ell, um—that—well, that—I touched cocaine that time. The mother of my youngest son ***, she was on drugs." On redirect examination, respondent said that was his only positive drug test. Respondent rested. No other evidence was presented.

¶ 21 Before rendering its decision, the trial court noted respondent's most recent conviction for possession of cannabis between 30 and 50 grams with intent to deliver in Macon County case No. 15-CF-842. The court then rendered its decision on the record, recounting the

testimony from the witnesses. The court expressly found the State failed to prove respondent unfit on the grounds related to his reasonable efforts and reasonable progress. The court *did* find the State sufficiently proved respondent unfit on the remaining two grounds: (1) failing to maintain a reasonable degree of interest, concern, or responsibility toward the minors (750 ILCS 50/1(D)(b) (West 2018)) and (2) depravity (750 ILCS 50/1(D)(i) (West 2018)). The court stated:

"My reasons—the reasons for my analysis are as follows: With respect to the issue of reasonable degree of interest, concern, or responsibility, I typically have these cases in which it seems to me that the responsibility is the factor that is of most concern. In this case, he is providing a home for at least one child. But I question the degree of interest in behalf of the father. It's unrebutted, of course, that he—it's a fact that he lives [in] Atlanta. The case [has] been going on since November 2016 it looks like.

So, I believe that the State has proven by clear and convincing evidence that he's unfit for maintaining a reasonable degree of interest, concern, or responsibility.

As to the depravity issue, there are, obviously, six felony convictions. The most recent one, according to my review, the [case No.] 15-CF-142. A conviction occurred *** on February 26th of 2016. According to [the certificate of conditions], the charge was possession of cannabis between 30 and 50 grams with the intent to deliver. I note that particular conviction.

I also, I think, I already noted, in my oral comments, that there had been, at least some threats to a foster parent. And although I have considered the fact that *** he is working, works full-time, I believe in a position—a job as well as *** some degree of self-employment. He does pay taxes.

But based on my weight, that I'[ve] assigned to the different evidence, that's been submitted, I do not believe he has rebutted the presumption of depravity."

¶ 22                                 C. Best-Interests Hearing

¶ 23       The trial court held the best-interests hearing in January 2021. The State called T.L.'s counselor, Julie Blythe of Lutheran Child and Family Services, as a witness. She testified T.L. had been diagnosed with attention deficit hyperactivity disorder (ADHD) with impulsivity, post-traumatic stress disorder, and adjustment disorder with disturbance of emotions and conduct. T.L. witnessed domestic violence, she was a victim herself, she had been neglected, and she was suspected of being sexually abused, though she would not talk about it and it had not been proven. Still, according to Blythe, T.L. demonstrated behavior "that goes along with" being sexually molested, so Blythe counseled T.L. as if she had been sexually abused.

¶ 24       Blythe said T.L. visited with her parents recently. Although she was happy to see her mom, she "was very, very nervous about her dad and what he might do to her." T.L. witnessed respondent threaten his sister, who is T.L.'s aunt and foster parent.

¶ 25       Blythe testified T.L. was doing great with counseling and had made tremendous strides with improving her behavior. According to Blythe, T.L. had "horrible angry outbursts" when she began counseling, but she was now doing much better. Blythe said T.L. was "happier," she "loves where she is," and she "wants to stay there." In Blythe's opinion, it would be in T.L.'s best interest to "stay where she is, and that is what [T.L.] told [her] she wants." Blythe said T.L. is "[i]ncredibly bonded" to her foster parent. A negative aspect of her foster home is that T.L. does not get to see her siblings as much as she would like, but Blythe said she does not know the reason for that, as that would be "more of a caseworker question."

¶ 26       The State next called Lynley Young, the foster care manager at Webster-Cantrell

Youth Advocacy and the preparer of the best-interests report. Young stated she recommended respondent's parental rights be terminated. She testified the minors remained in separate foster homes. T.L.'s foster parent was willing to adopt, but D.C.'s foster parent was undecided. She was concerned she would be unable to handle D.C. as he grew older.

¶ 27 Young testified D.C. is having a lot of anger and behavioral issues. He is currently in counseling but is usually uncooperative. He "is not always pleased with being where he is [in terms of foster placement], but he doesn't know where else he would want to be." He is struggling with remote learning, but a school liaison makes weekly visits to the house, which has been very helpful.

¶ 28 T.L. is doing very well in her placement, as there has been "a lot of growth." She still has some anger and behavioral issues, but she "has made great improvements." T.L. is "extremely bonded" to her foster family and doing "wonderful[ly]" with remote learning. Her foster parent is meeting T.L.'s medical needs, which are "not major issues" and can be treated with medication.

¶ 29 The best-interests report corroborated Young's testimony. Young's report recommended both minors remain in their respective placements and that respondent's parental rights be terminated.

¶ 30 The State asked the trial court to consider the best-interests report. With that, the State rested.

¶ 31 Respondent testified he lives in Atlanta, Georgia, and is still employed at the concrete company while doing subcontracting work for other concrete companies. He said he owns two homes.

¶ 32 Respondent explained he gets along with T.L.'s foster mother, his sister, "from time

to time." He said he has not seen his kids in two years. He testified:

> "I mean, I'm just—my thing is, you know, I knew from the beginning that I wasn't going to get my kids back. But, you know, I just want to say this: I'm not trying to stop the placement or anything right now, but I just wanted just the courts to know that since this thing has begun, I knew that my sister—my sister said she was going to help me get my kids back. I did everything that I could do to the best of my ability to get them back. I did nothing to lose my kids. My sister made—she said she was going to help me. It was all a trick from the beginning to get income. I didn't look at it like that back then, you know, and that was her only income."

¶ 33 Respondent said he wants T.L. placed with his mother, rather than his sister, so T.L. can be surrounded by his extended family. He said he has been helping D.C. with school and his behavioral problems. According to respondent, he and D.C. discussed the importance of D.C. staying with his grandmother. Although respondent agrees it will be in D.C.'s best interests to stay in his current placement, he does not believe it will be in D.C.'s best interests to terminate his parental rights. He said he is a great father. He asked the trial court to transfer guardianship of the minors to his mother and keep his parental rights intact. He said he was a "changed person." Respondent rested.

¶ 34 After the arguments of counsel, the trial court indicated it had considered the statutory best-interests factors, labeling the factors "most applicable to this case" as: "the children's sense of attachment where they feel a sense of love, continuity, familiarity, and also their need for permanency, and that's, I think, probably the most important factor in this case, their need for permanence, including their need for stability and continuity of relationships with parent figures." The court then reviewed the oral testimony, highlighting the following facts: T.L. was

- 10 -

thriving and "incredibly bonded" to her foster parent; T.L. was in a potential adoptive placement; D.C. has behavioral issues, leading his foster parent to question adoption; and although respondent loves his children, the existence of a parent-child bond was questionable so as to translate into any kind of permanent arrangement. The court concluded the State proved by a preponderance of the evidence that it is in T.L.'s and D.C.'s best interests that respondent's parental rights be terminated.

¶ 35        The trial court's written judgment outlined its findings from the fitness and best-interests hearings. Specifically, the court's order found: (1) the State had proven by clear and convincing evidence that respondent was an unfit person within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) and (2) it was in the best interests of the minor children (T.L. and D.C.) and the public that respondent have his residual parental rights and responsibilities terminated and the children relieved of all obligations of obedience and maintenance with respect to respondent.

¶ 36        This appeal followed.

¶ 37                              II. ANALYSIS

¶ 38        Respondent argues the trial court erroneously terminated his parental rights because the court's unfitness and best-interests determinations are against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 39        The Juvenile Court Act (705 ILCS 405/1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person" and then the State must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998) and the

- 11 -

Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998)). Here, respondent challenges the trial court's determinations at each of these steps. We address his challenges in turn.

¶ 40                                    A. Unfitness Finding

¶ 41        " 'The State must prove parental unfitness by clear and convincing evidence.' " *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004)). The Adoption Act provides several grounds on which a trial court may find a parent "unfit." Here, the State alleged, and the trial court found, respondent was unfit on the following grounds: (1) his failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2018)) and (2) depravity (750 ILCS 50/1(D)(i) (West 2018)). Despite multiple potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83; see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006) ("A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act.") (citing *In re D.D.*, 196 Ill. 2d 405, 422 (2001)).

¶ 42        Addressing the ground of depravity, respondent claims after he rebutted the presumption he was depraved because of his criminal record, he proved he was not depraved. He argues, therefore, the trial court erred by finding him unfit.

¶ 43        Appellate courts must give great deference to a trial court's finding of unfitness and must not reverse such a finding unless it is against the manifest weight of the evidence. A finding is against the manifest weight of the evidence only if the opposite conclusion is readily apparent. *In re J.A.*, 316 Ill. App. 3d 553, 561 (2000).

¶ 44        One of the grounds for unfitness is depravity. 750 ILCS 50/1(D)(i) (West 2018).

The depravity statute states that "[t]here is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies *** and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 2018).

"A rebuttable presumption creates a *prima facie* case as to the particular issue in question and thus has the practical effect of requiring the party against whom it operates to come forward with evidence to meet the presumption. [Citation.] However, once evidence opposing the presumption comes into the case, the presumption ceases to operate, and the issue is determined because of the evidence adduced at trial as if no presumption had ever existed. [Citation.] The burden of proof does not shift but remains with the party who initially had the benefit of the presumption. [Citation.] The only effect of the rebuttable presumption is to create the necessity of evidence to meet the *prima facie* case created thereby, and which, if no proof to the contrary is offered, will prevail." (Internal quotation marks omitted.) *J.A.*, 316 Ill. App. 3d at 562-63.

¶ 45  The Illinois Supreme Court has defined "depravity" as "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *Stalder v. Stone*, 412 Ill. 488, 498 (1952). Depravity must be shown to exist at the time of the petition to terminate parental rights, and "the 'acts constituting depravity *** must be of sufficient duration and of sufficient repetition to establish a "deficiency" in moral sense and either an inability or an unwillingness to conform to accepted morality.' " *J.A.*, 316 Ill. App. 3d at 561 (quoting *Ornstead v. Kleba*, 37 Ill. App. 3d 163, 166 (1976)). The presumption of depravity is rebuttable, and the "parent is still able to present evidence showing that, despite his convictions, he is not depraved." *J.A.*, 316 Ill. App. 3d at 562.

¶ 46        Here, the State presented certified copies of respondent's seven felony convictions. Contrary to respondent's argument, those certified copies were sufficient to create a *prima facie* case of depravity, as the statute does not require any further information, detail, or specific circumstances. See *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 32 ("[T]he legislature approved the use of three felony convictions alone to create a *prima facie* case of depravity.").

¶ 47        One of respondent's felony convictions was within five years of the filing of the termination petition. Therefore, under section 1(D)(i), the State's evidence created a rebuttable presumption that the respondent was depraved.

¶ 48        Respondent offered evidence that he was not depraved. Under the analysis in *J.A.* concerning rebuttable presumptions, once the respondent's evidence came into the case, the presumption of depravity ceased to exist. The burden remained with the State to prove by clear and convincing evidence that respondent was unfit because of depravity. In turn, respondent could attempt to prove that he was not depraved.

¶ 49        As noted above, the State's evidence consisted of the respondent's convictions for seven felonies between 2008 and 2016. These convictions showed clear and convincing evidence of respondent's inherent deficiency of moral sense and rectitude. See *Stalder*, 412 Ill. at 498.

¶ 50        Respondent argued he was not depraved because he completed all of his required services and had been employed at the same job for 11 years. However, this argument is belied by the fact he was convicted of three of his felonies while he was employed. While commendable, the status of being employed did not show he was no longer depraved. During his employment, he was convicted of (1) a violation of an order of protection with a prior violation of an order of protection, (2) forgery, and (3) unlawful delivery of cannabis. He also threatened T.L.'s foster mother in T.L.'s presence, conduct which led to an order of protection based on stalking and

intimidation of her.

¶ 51     Given that respondent produced evidence to rebut the presumption of depravity, the trial court was to decide the issue based on all of the evidence adduced, as if the presumption never arose. *J.A.*, 316 Ill. App. 3d at 562. In our review, we are mindful of the deference we are to give to the trial court's finding of depravity in light of its ability to "closely scrutinize [respondent's] character and credibility." *J.A.*, 316 Ill. App. 3d at 563. On the record before us, we conclude the trial court's finding of unfitness based on depravity was not against the manifest weight of the evidence because a conclusion that respondent was not depraved or had been rehabilitated was not clearly evident. See *In re J'America B.*, 346 Ill. App. 3d 1034, 1045 (2004) (noting that a decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented).

¶ 52     In summary, after respondent's evidence was admitted and the rebuttable presumption of depravity ceased to exist, the burden remained with the State to prove by clear and convincing evidence that respondent was depraved. The State's evidence was sufficiently clear and convincing to prove respondent was depraved. Therefore, we hold it was not against the manifest weight of the evidence for the trial court to find respondent was unfit because of depravity.

¶ 53     Because we affirm the trial court's finding of unfitness on the ground of depravity, we need not address respondent's contentions regarding the other basis of unfitness. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 2 (stating a single ground of unfitness under section 1(D) is sufficient to support a finding of unfitness).

¶ 54                              B. Best-Interests Determination

¶ 55     Once a trial court finds a parent an "unfit person," it must next consider whether

terminating that person's parental rights serves the minors' best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004); see also *Julian K.*, 2012 IL App (1st) 112841, ¶ 80 (stating, once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child."
> *Daphnie E.*, 368 Ill. App. 3d at 1072; see also 705 ILCS 405/1-3(4.05)(a) to (j) (West 2018).

¶ 56        A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. The court's decision will be found to be "against the manifest

weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 57    Respondent contends the trial court's determination that it was in the children's best interests to terminate his parental rights is against the manifest weight of the evidence. Respondent argues the foster mothers (respondent's sister and mother) do not get along and have not spoken in over 20 years. He claims that "[h]aving the siblings separated in two separate homes is not in their best interests." And, since no one in the family gets along with his sister, T.L. will "miss out" on interactions with her family.

¶ 58    The State, on the other hand, presented copious evidence showing that terminating respondent's parental rights serves the best interests of the children. Through testimony and a written report from Young, the State presented the court with evidence that T.L. was doing very well in her placement. Her behavior has greatly improved, and she is very bonded to her foster mother and her siblings in the home. D.C. was content in his placement as well. Although he was often uncooperative and struggled with behavioral issues, he did not want to be in a placement anywhere other than with his grandmother.

¶ 59    The trial court identified two statutory factors as "most applicable" in its best-interests determination: first, "the children's sense of attachment, where they feel a sense of love, continuity, [and] familiarity"; and second, "their need for permanence, including their need for stability and continuity of relationships with parent figures." See 705 ILCS 405/1-3(4.05) (West 2018). After reviewing the above evidence—the best-interests report and her testimony— the trial court echoed Young's determination that "it would be in the children's best interest to remain in their present placements with the goal of adoption."

¶ 60　　　　Since the evidence does not lead us clearly to opposite conclusions, we cannot say this best-interests determination goes against the manifest weight of the evidence.

¶ 61　　　　　　　　　　　　　　III. CONCLUSION

¶ 62　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 63　　　　Affirmed.